IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Riverview School District,     :
      Appellant   :
          :  No. 634 C.D. 2017
     v.     :
          :  Argued:  November 13, 2017
Riverview Education Association,  :
PSEA/NEA       :


BEFORE:  HONORABLE RENÉE COHN JUBELIRER, Judge
      HONORABLE PATRICIA A. McCULLOUGH, Judge
      HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge


*OPINION NOT REPORTED*

MEMORANDUM OPINION
BY JUDGE McCULLOUGH       FILED:  January 5, 2018


    Riverview School District (the District) appeals from the April 12, 2017 order of the Court of Common Pleas of Allegheny County (trial court) denying the District's petition to vacate an arbitration award.  By opinion and award dated June 28, 2016, the Arbitrator sustained in part and denied in part a grievance filed by Riverview Education Association and PSEA/NEA (collectively, the Association) on behalf of Bernard Campbell.  More specifically, the Arbitrator sustained Campbell's grievance insofar as he was discharged and directed that he be reinstated effective January 1, 2016.  However, the Arbitrator denied Campbell's grievance as to his suspension without pay for the period from March 23, 2015, until December 31, 2015.

## Facts and Procedural History

The following facts are garnered from the Arbitrator's award. The District and the Association are parties to a collective bargaining agreement (CBA) effective July 1, 2014, through June 30, 2018. A dispute arose between the parties with regard to the termination of a professional employee, Campbell, who taught in the District's Tenth Street Elementary School. Campbell's wife is also employed by the District as a special education teacher. (Arbitrator's Decision at 2, 21.)

In June of 2012, Campbell had been admonished by the Superintendent and directed to maintain proper, professional boundaries with a different female colleague. Subsequent thereto, the collegial relationship between Campbell and another teacher, Beth Funtal, changed significantly. Campbell's visits to Funtal's classroom became more frequent; he tried to converse with her in closer proximity; and he presented her with gifts and correspondence suggesting they engage in a romantic relationship, even though both he and Funtal were married. Campbell would also sit next to her and at times place his hand on her knee or kiss her head. Funtal rebuffed these actions by Campbell and repeatedly asked him to step back and leave her alone/get out of her classroom. While away on a college visit with her daughter, Funtal received several text and email messages from Campbell, which made her uncomfortable. Upon her return, Campbell left a package for Funtal with a stuffed mascot of the school that she and her daughter had visited, along with a note that she found odd and discomforting. Funtal discussed the situation with some colleagues but did not confront Campbell regarding this incident. (Arbitrator's Decision at 3-7, 20.)

In May of 2014, Campbell placed several photographs of Funtal's daughter, along with a Mother's Day card, in Funtal's personal bookbag. Around Halloween, Campbell gained access to Funtal's locked classroom and decorated the room with Halloween decorations. In January of 2015, Campbell presented Funtal with

2

a small box as a Christmas present, which included an oversized clothespin with her name, a note that said "hoodie," and a letter that included numerous references to his desire for a romantic relationship with her.[1]  Campbell again expressed his desire for a relationship with Funtal in subsequent conversations.  Funtal eventually sent an email to Principal David Zolkowski complaining that Campbell's conduct crossed professional boundaries and intruded into her personal space.  She noted that she had trouble sleeping and sought counseling from the Center for Victims.  (Arbitrator's Decision at 9-15.)

On January 29, 2015, Funtal filed a formal complaint against Campbell with the District.  Principal Zolkowski and Dr. Ashley Coudriet, the District's Title IX Coordinator,[2] initiated an investigation and conducted personal interviews with numerous employees, including Funtal and Campbell.  Principal Zolkowski and Dr. Coudriet reported their findings to the Superintendent, Dr. Margaret DiNinno.  By letter dated February 12, 2015, the District advised Campbell that he was being placed on administrative leave with pay.  (Arbitrator's Decision at 25.)

The District subsequently met with Campbell and his union representatives.  By letter dated March 20, 2015, the District informed Campbell that he was being suspended effective March 23, 2015, without pay.  On March 25, 2015, the Association filed a grievance on behalf of Campbell, alleging that the District violated the CBA by imposing discipline without just cause.  The District thereafter

---

[1] The letter was admitted into evidence before the Arbitrator and is reproduced in the Arbitrator's decision.  While we will not recite the same in its entirety, the letter clearly expressed that Campbell had feelings for Funtal, whom he referred to throughout as "Bethie," noting that their relationship was "different than most," how her smile "had more to do with how we felt," how he and Funtal were "two people who cared a great deal for one another" and could have had a "much different relationship" given a different time and place, his desire to kiss her years ago, and the numerous times he "felt like kissing [her] and didn't."  (Arbitrator's Decision at 12-13.)

[2] Referring to Title IX of the Education Amendments of 1972, 20 U.S.C. §§1681-1688.

3

opted to dismiss Campbell from employment and provided him with a statement of charges and notice of hearing on July 25, 2015. The District charged Campbell with willful neglect of duties; persistent negligence in the performance of duties; persistent and willful violation of, or failure to comply with, school laws of the Commonwealth, including District policies and directives; immorality; and intemperance. The parties agreed that the grievance filed by Campbell would serve as the continuing vehicle to address his unpaid suspension and pending termination. (Arbitrator's Decision at 25.)

### Arbitrator's Hearings and Award

The Arbitrator conducted hearings on February 10 and March 18, 2016. Funtal testified that she worked for the District for 17 years, many of those years with Campbell, and that she is married with four grown children. While they often shared special education students and worked on projects together, Funtal stated that their collegial relationship started changing in 2013 as Campbell's visits to her classroom became more frequent and uncomfortable. Funtal explained that Campbell regularly engaged in non-work-related, personal conversations, and routinely invaded her personal space to the point where she asked him to step back. Funtal acknowledged that Campbell often brought her small token gifts, such as a candy bar or bottle of water, when she was having a bad day, and she often chatted with him over the same or with regard to computer issues she was having. However, Funtal noted that several times she received gifts that made her uncomfortable or Campbell would place his hand on her knee or kiss her head, to which she implored him to leave her alone. (Arbitrator's Decision at 3-5.)

Funtal also acknowledged that Campbell had assisted her with filling orders at her husband's pierogi business on at least one occasion in the fall of 2013, and later in soliciting support via email for this business in a local magazine contest.

4

However, Funtal described an incident occurring over a period of four days in April 2014, when she visited her daughter at college and Campbell sent her several text messages at or near midnight, including one asking her to let him know that she got home. Funtal testified that later that same week, she received a package which included a stuffed mascot of her daughter's school, and a floral card with a handwritten note from Campbell that made her feel very uncomfortable. After receiving this package, Funtal noted that she talked to Matt Schenle, a co-worker and Association representative, about it. While Schenle expressed surprise to learn the package came from a fellow teacher, he did not make plans to discuss the situation with Campbell. Nevertheless, Funtal herself spoke with Campbell the next week and informed him that she felt uncomfortable, and that his behavior was upsetting and out of line. Funtal noted that although Campbell insisted he was just trying to be nice, she felt distracted the rest of the day. Funtal also testified that in May 2014, she received a note from Campbell that was addressed to "Bethie," a name that no one, including her husband, ever called her. (Arbitrator's Decision at 5-9.)

Later in May 2014, around Mother's Day, Funtal explained that Campbell, without her knowledge, placed several photographs of her daughter and the daughter's dance team, along with a Mother's Day card, in her personal bookbag. Although Funtal thought it was a nice gesture, she felt it was also strange that Campbell had kept copies of photos from a year ago when he assisted her with another project. Funtal personally told Campbell that his actions were inappropriate, he apologized, and she did not report him to the Association or the District. (Arbitrator's Decision at 9.)

During the next school year, 2014-2015, Funtal acknowledged that she requested Campbell's assistance with printing out a boarding pass from her computer and he obliged. Around Halloween, Funtal noted that she was again uncomfortable because Campbell had gained access to her locked classroom and decorated for the

occasion. Funtal talked to Campbell but did not report his actions to the Association or the District. At the end of November, Funtal stated that Campbell emailed her at a time when his daughter was undergoing surgery on her hand and she believed him to be at the hospital with his wife. She felt the email was awkward and discussed it with Schenle, who suggested that she respond to Campbell and his wife, which she did. Subsequently, Funtal noted that Campbell questioned her as to why she did not respond further since she knew of the surgery and he really needed her at that time. Early in 2015, Funtal testified that Campbell came to her classroom with a small box that contained an oversized clothespin with her name on it, a note that said "hoodie," and a card and letter discussing his romantic feelings for her. (Arbitrator's Decision at 10-13.)

Funtal again felt uncomfortable and proceeded to show the letter to Schenle, who advised her that the letter was wrong and that she needed to do something about Campbell's actions. The next day, Funtal stated that Campbell came to her classroom and inquired about the gift and letter, to which she responded that there was nothing to talk about and there was no relationship between them. Funtal noted that Campbell insisted that, if not for their respective spouses, they would be together. She described Campbell as becoming very agitated, frustrated, and argumentative. Fearing for her safety, Funtal testified that she emailed Principal Zolkowski on January 26, 2015. After being unable to sleep because of the situation, and seeking advice from a friend, she sought help from the Center for Victims. (Arbitrator's Decision at 13-15.)

Christine Maisto, a special education teacher who worked closely with Funtal, testified that she often observed Campbell in or near Funtal's classroom and that Funtal had asked her on occasions to come up to her classroom or stay in the room with her because Funtal was uncomfortable with Campbell. On the day Funtal received the box with her daughter's school mascot, Maisto stated that she was asked to come

6

to Funtal's room and Funtal appeared upset, shaken, and confused. While Campbell had informed Maisto that he was concerned for Funtal, Maisto noted that she advised Campbell that Funtal was capable of handling her students and that additional gifts were unnecessary. After receiving the photographs of her daughter, Maisto described Funtal as increasingly nervous and upset, which was impacting her teaching. Maisto indicated that she and Schenle read the letter from Campbell, that Funtal was obviously shocked and embarrassed by the letter, and that the letter was inappropriate and crossed the line. (Arbitrator's Decision at 16-17.)

Schenle testified that he worked at the same school as Funtal and Campbell as an elementary teacher and served as the building representative for the Association. He, too, often observed Campbell entering or leaving Funtal's classroom and often witnessed Funtal asking Campbell to leave the room. Schenle described the gift of a stuffed mascot as very inappropriate and observed that Funtal was upset after receiving it. He advised Funtal that she needed to do something about it, but recognized it was a difficult situation involving two colleagues. He also described Funtal as troubled by receipt of the Mother's Day card and photographs of her daughter. Regarding the letter written by Campbell, Schenle stated that he never witnessed any behavior between Funtal and Campbell that would indicate they were in a relationship and that Funtal's interest was purely professional. He noted that the letter was wrong and suggested that he would accompany Funtal to report the same to the administration when she was ready. (Arbitrator's Decision at 17-18.)

Dr. DiNinno, the District's Superintendent, testified that she first became aware of the situation upon notice from Principal Zolkowski and she felt that the situation warranted further investigation. On or about February 9, 2016, Dr. DiNinno stated that she received a copy of the romantic letter that Campbell sent to Funtal and immediately contacted the District's solicitor. Dr. DiNinno noted that Campbell was

7

placed on paid administrative leave at that time. However, after she met with the District's solicitor, Funtal, and Campbell, Dr. DiNinno indicated that the District convened a *Loudermill*[3] hearing and converted Campbell's leave to an unpaid leave. Dr. DiNinno explained that the conversion to unpaid leave was predicated on the romantic letter, as well as the unwelcome gifts and cards, that Funtal received from Campbell. Dr. DiNinno also noted that Campbell had signed an acknowledgement when he received the District's harassment policy. She emphasized that he had been previously warned in June of 2012 to remain professional and maintain social distance from another employee to ensure that nothing new, inappropriate, or ambiguous occurs with respect to the relationship between him and the other employee. (Arbitrator's Decision at 18-20.)

Upon conclusion of the District's investigation and consultation with the solicitor, Dr. DiNinno determined that Campbell's conduct was inappropriate and impacted not only Funtal, but other teachers as well. She described Campbell's behavior as affecting Funtal's work and consuming her time. She was aware of the collegial friendship between Funtal and Campbell over the years, but noted that Campbell seemed to progressively transform it into a more intense and one-sided relationship, which he refused to stop even after being told it was inappropriate and which culminated in the romantic letter. Hence, Dr. DiNinno made the decision to terminate Campbell's employment. (Arbitrator's Decision at 20.)

Campbell testified on his own behalf, noting his 20 years of employment with the District, his marriage to a fellow special education teacher, Sylvia Campbell, and his work with special needs students. (Arbitrator's Decision at 21.) He stated that

---

[3] Referring to *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985), which requires that a teacher be given notice and opportunity to respond to any charges levied against him in a formal hearing before being terminated.

he and Funtal often had six or seven special needs students in common and they regularly discussed these students. *Id.* He stated that on many occassions he assisted Funtal with both work-related and non-work-related tasks and he considered her a friend. *Id.* Campbell denied that Funtal ever asked him to stop visiting her classroom or told him that she felt uncomfortable. *Id.* He testified that the gifts were meant to cheer Funtal up because she was having difficulty with a certain student. *Id.* He denied ever discussing a sexual relationship with Funtal, but did not deny having sent the romantic letter. However, he described the letter as "just ramblings and things that he should have never written." (Arbitrator's Decision at 22.) He stated that the letter was not meant to upset Funtal and was written when he "wasn't at a good place at the time." *Id.* He expressed that he was "truly sorry" to have upset Funtal, and that he believed he could still work in the same building with her, strictly as colleagues. *Id.*

Ultimately, the Arbitrator issued an award sustaining in part and denying in part Campbell's grievance. The Arbitrator sustained Campbell's grievance insofar as he was discharged, and directed that he be reinstated effective January 1, 2016. However, the Arbitrator denied Campbell's grievance as to his suspension without pay for the period from March 23, 2015, until December 31, 2015.

In his decision, the Arbitrator acknowledged that in 2012, the District enacted an Unlawful Harassment Policy, Policy No. 348, which maintains a **zero tolerance policy** against "***all forms of unlawful harassment of employees*** and third parties by all district students and staff members" and further states that:

> For purposes of this policy, ***harassment*** shall consist of verbal, written, graphic or physical conduct relating to an individual's race, color, national origin/ethnicity, sex, age, disability, sexual orientation, religion or genetic information when such conduct:
>
> 1. Is sufficiently severe, persistent ***or*** pervasive

9

that it affects an individual's ability to perform job functions *or* creates an intimidating, threatening *or* abusive work environment.

2. Has the purpose *or effect* of substantially *or* unreasonably interfering with an individual's work performance.

3. Otherwise adversely affects an individual's employment opportunities.

(Arbitrator's Decision at 26-27) (emphasis in original). The Arbitrator also acknowledged that Campbell had been cautioned in June 2012 that his conduct towards female colleagues may make them uncomfortable. *Id.* at 28. While noting that Campbell was present in Funtal's classroom far more than what was collegially necessary, the Arbitrator emphasized that Funtal and Campbell had interacted over the years in a friendly manner outside of a professional relationship and there were no problems until 2014. *Id.* at 28, 31. The Arbitrator proceeded to discuss each of the seven specific incidents that occurred from 2014-2015 separately, as though each incident was isolated from the other.[4]

Ultimately, the Arbitrator concluded that, while certainly inappropriate, Campbell's conduct did not constitute sexual harassment. The Arbitrator emphasized that cases of sexual harassment generally "involve an individual transgressor who by virtue of either supervisory or managerial authority, either engaged in such conduct, or

---

[4] The Arbitrator identified the seven incidents as:
    a. The "[stuffed mascot] incident"
    b. Mother's Day Gift
    c. The unsolicited Halloween decorations
    d. The hospital waiting room e-mail
    e. The Christmas gift kerfuffle
    f. The 9 page handwritten letter
    g. The gifts and cards

(Arbitrator's Decision at 67.)

an employer who allowed such conduct to take place without intervention." (Arbitrator's Decision at 66.) The Arbitrator proceeded to note that, in this case, "There was no groping, no sexual contact, no offers of quid pro quo, and no demeaning or criticism or other unlawful conduct based upon sex." *Id.* The Arbitrator specifically described the romantic letter as "at a minimum[,] an exercise of poor judgment, and that the content of the letter was a further demonstration of poor judgment which understandably upset Ms. Funtal, and rightly so." (Arbitrator's Decision at 71.) The Arbitrator concluded that the letter, along with the gifts, equated to misconduct, but neither, by itself, constituted harassment or created a hostile work environment, nor violated the District's policy. While the Arbitrator indicated that such misconduct warranted discipline, he did not believe that it warranted a discharge. In that regard, the Arbitrator concluded that Campbell's unpaid suspension of approximately nine months was the appropriate discipline.

**Appeal to Trial Court**

The District thereafter filed a petition to vacate the Arbitrator's award with the trial court. By order dated April 12, 2017, the esteemed trial court judge denied the District's petition, concluding that the Arbitrator's decision drew its essence from the CBA and did not violate public policy. The trial court went on to state in this order that Campbell's "misconduct, while serious, was not so egregious that public policy prohibited his reinstatement with a lengthy suspension" and that "the law does not require termination of employees in every case of sexual harassment," citing *Philadelphia Housing Authority v. American Federation of State, County and Municipal Employees, District Council 33, Local 934*, 956 A.2d 477 (Pa. Cmwlth. 2008). The trial court did not issue an opinion in this case.

11

## Discussion

The District thereafter filed a notice of appeal to this Court,[5] arguing that the trial court erred in failing to vacate the Arbitrator's award because (1) the award violates the public policy against sexual harassment in the workplace, and (2) the trial court failed to take into account the independent grounds for termination under section 1122(a) of the Public School Code of 1949 (School Code), Act of March 10, 1949, P.L. 30, *as amended*, 24 P.S. §11-1122(a).

## Essence Test

Grievance awards are reviewed under the deferential essence test, which requires an award to be confirmed if (1) the issue as properly defined is within the terms of the agreement; and (2) the award can be rationally derived from the agreement. *Fraternal Order of Transit Police v. Southeastern Pennsylvania [Transportation] Authority*, 114 A.3d 893, 898 (Pa. Cmwlth. 2015). A reviewing court will not second-guess the arbitrator's fact-finding or interpretation as long as the arbitrator has arguably construed or applied the CBA. *Id.* Indeed, this Court will only vacate an arbitrator's award under the essence test "where the award indisputably and genuinely is without foundation in, or fails to logically flow from, the collective bargaining agreement." *Slippery Rock University of Pennsylvania, Pennsylvania State System of Higher Education v. Association of Pennsylvania State College & University Faculty*, 71 A.3d 353, 358 (Pa. Cmwlth. 2013) (quoting *State System of Higher Education (Cheney University) v. State College and University Professional Association (PSEA-NEA)*, 743 A.2d 405, 413 (Pa. 1999)).

---

[5] By single-judge memorandum opinion and order dated August 1, 2017, this author granted the District a stay of the Arbitrator's award pending appeal.

12

**Public Policy Exception to the Essence Test**

However, in *Westmoreland Intermediate Unit #7 v. Westmoreland Intermediate Unit #7 Classroom Assistants Educational Support Personnel Association, PSEA/NEA* (*Westmoreland I*), 939 A.2d 855, 865 (Pa. 2007), our Supreme Court adopted a public policy exception to the essence test that permits a reviewing court to consider whether the arbitrator's award violates an established public policy. Under the public policy exception to the essence test, an arbitration award may be set aside if it violates a "well-defined, dominant" public policy "ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." *Id.* at 866. In deciding whether to apply the public policy exception, the court must consider (1) the nature of the employee's conduct leading to his or her discipline; (2) whether the employee's conduct implicates a well-defined, dominant public policy; and (3) whether the arbitration award poses an unacceptable risk that it will undermine the implicated policy. *Slippery Rock University of Pennsylvania,* 71 A.3d at 363. An arbitration award that explicitly conflicts with a well-defined public policy must be vacated. *Id.*

**Public Policy Against Sexual Harassment**

In *Philadelphia Housing Authority*, this Court stated, "[i]t now is well established that there is an explicit, well-defined, and dominant public policy against sexual harassment in the workplace." 956 A.2d at 483 (citations omitted.) We also noted as follows:

> Title VII of the Civil Rights Act of 1964 prohibits employment discrimination on the basis of sex. 42 U.S.C.

13

§2000e-2. The Equal Employment Opportunity Commission (EEOC), which administers and enforces this provision, has promulgated regulations that define sexual harassment under Title VII and provides that unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment (a form of sex discrimination) when such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment. 29 C.F.R. §1604.11(a).

Because Title VII charges employers with the responsibility to maintain a workplace environment free of sexual harassment, there also exists a well-defined, dominant public policy favoring voluntary employer prevention of sexual harassment in the workplace and application of sanctions against those who commit such conduct. EEOC regulations on voluntary employer compliance make employers liable for acts of sexual harassment in the workplace between fellow employees where the employer knew or should have known of the conduct, "unless it can show that it took immediate and appropriate corrective action." 29 C.F.R. §1604.11(d).

. . .

Section 5(a) of the Pennsylvania Human Relations Act (PHRA)[6] also prohibits discrimination on the basis of sex and has been interpreted to include sexual harassment that is severe or pervasive enough to create a hostile work environment. 43 P.S. §955(a). Moreover, pursuant to its statutory authority to adopt rules and regulations to effectuate the policies and provisions of the PHRA, the Pennsylvania Human Relations Commission has adopted guidelines on sexual harassment that are very similar to those promulgated by the EEOC.

---

[6] Act of October 27, 1955, P.L. 744, *as amended,* 43 P.S. §955(a). In deciding sexual harassment cases under the PHRA, Pennsylvania courts look to federal court decisions interpreting Title VII. *Hoy v. Angelone*, 691 A.2d 476, 480 (Pa. Super. 1997), *aff'd*, 720 A.2d 745 (Pa. 1998).

*Id.* at 483-84.

### Application of Public Policy Exception to Present Case

The District argues that the trial court erred in failing to vacate the Arbitrator's award because the award violates the public policy against sexual harassment in the workplace.

As the District notes in its brief, "There is a well-defined and dominant public policy prohibiting sexual harassment in the workplace which can be ascertained by reference to law and legal precedent." (Brief of District at 24.) Indeed, such public policy has been recognized by our United States Congress in Title VII of the Civil Rights Act of 1964, by our United States Supreme Court and other federal courts, by our General Assembly, and by this Court. *See* 42 U.S.C. §2000e-2; *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57 (1986); *Stroehmann Bakeries, Inc. v. Local 776, International Brotherhood of Teamsters*, 969 F.2d 1436 (3d Cir. 1992), *cert. denied*, 506 U.S. 1022 (1992); *Chrysler Motors Corporation v. International Union, Allied Industrial Workers of America, AFL-CIO*, 959 F.2d 685 (7th Cir. 1992), *cert. denied*, 506 U.S. 908 (1992); Section 5(a) of the Pennsylvania Human Relations Act, Act of October 27, 1955, P.L. 744, *as amended*, 43 P.S. §955(a) (prohibits discrimination on the basis of sex and has been interpreted to include sexual harassment that is severe or pervasive enough to create a hostile work environment); *Philadelphia Housing Authority*.

Additionally, this important public policy has been recognized by Pennsylvania's Code of Professional Practice and Conduct for Educators (Code),[7] established by the Professional Standards and Practices Commission (Commission).

_____

[7] 22 Pa. Code §§235.1 – 235.11.

15

The Code establishes "high standards for preparation, certification, practice and ethical conduct in the teaching profession." Section 235.1 of the Code, 22 Pa. Code §235.1. Section 235.3(b) of the Code specifies that educators must value "the worth and dignity of every person, student **and colleague alike** . . . ." 22 Pa. Code §235.3(b) (emphasis added). Section 235.4(b)(4) directs that educators "respect the civil rights of all and not discriminate on the basis of . . . sex or sexual orientation . . . ." 22 Pa. Code §235.4(b)(4). Most importantly, section 235.11(3) of the Code expressly states that a "professional educator may not . . . [s]exually harass a fellow employe." 22 Pa. Code §235.11(3).

In conjunction with the Code, the Commission has published an Educator Ethics and Conduct Toolkit (Toolkit) on its website[8] to be used as a guide for educators in the workplace. This Toolkit instructs educators, in fulfilling obligations to the school community, to respect the rights of all persons without discrimination; to interact with colleagues in a respectful and professional manner; to conduct himself in and out of school in a way that reflects well on the school; and to avoid activities that may be disruptive to the school community or erode an educator's effectiveness. This Toolkit also provides that, in fulfilling obligations to the profession, an ethical educator shall know and obey all laws, rules, and policies; extend equal treatment to all members of the profession; accept responsibility for maintaining ethical conduct; and communicate openly with colleagues and immediately address any concerns regarding a colleague's behavior. Further, as noted above, the District itself addressed this issue in 2012 with the enactment of Policy No. 348 (Unlawful Harassment Policy), which maintains a zero tolerance policy against all forms of unlawful harassment of

---

[8]Available at http://www.pspc.education.pa.gov/Promoting-Ethical-Practices-Resources/Ethics-Toolkit/Pages/default.aspx (last visited December 15, 2017).

16

employees and third parties by students and staff. Campbell even signed a form acknowledging his receipt of this policy.

As noted above, in deciding whether to apply the public policy exception, the court must consider: (1) the nature of the employee's conduct leading to his or her discipline; (2) whether the employee's conduct implicates a well-defined, dominant public policy; and (3) whether the arbitration award poses an unacceptable risk that it will undermine the implicated policy. *Slippery Rock University of Pennsylvania,* 71 A.3d at 363.

In the present case, the record reveals that Campbell had already been admonished by the Superintendent in June of 2012, for other inappropriate conduct, and he had been directed to maintain proper, professional boundaries with a different female colleague. Despite this prior admonishment, Campbell engaged in numerous inappropriate interactions with Funtal herein, as detailed in the Arbitrator's extensive findings and which the Arbitrator categorized only as "misconduct." While the Arbitrator described Campbell's actions as certainly inappropriate, and concluded that such actions did not constitute sexual harassment, the trial court's order appears to have disagreed with the Arbitrator's conclusion in certain respects and on one hand appears to deem Campbell's conduct as sexual harassment.[9] However, the trial court also states that this "misconduct" does not violate public policy, without any detailed analysis of the factors cited above. Indeed, in its petition to vacate, the District alleged that the Arbitrator erred in concluding that Campbell's conduct did not equate to sexual harassment given that the Arbitrator appears to have inappropriately limited sexual harassment to cases involving a person with supervisory or managerial authority over

---

[9] Conclusions of law are generally fully reviewable by this Court. *See Lewis v. Commonwealth*, 498 A.2d 800, 803 (Pa. 1985); *Braig v. Pennsylvania State Employes' Retirement Board*, 682 A.2d 881, 885 (Pa. Cmwlth. 1996).

the target of his/her conduct and requiring such conduct to be in the nature of groping, sexual contact, offers of a quid pro quo, or demeaning language/criticism. Additionally, the District alleged that the Arbitrator improperly isolated Campbell's interactions with Funtal into seven specific incidents and appears to have considered each incident separately, when in fact Campbell's actions should have been viewed and considered in their entirety.[10] Further, the District alleged that Campbell's actions violated its own Unlawful Harassment Policy and that it had a duty to protect Funtal, its employee, from sexual harassment under Title IX, the PHRA, and section 1122(a) of the School Code, which duty has been usurped by the Arbitrator's award directing Campbell's reinstatement.

The trial court did not address these issues raised by the District. Thus, this matter must be remanded to the trial court for further clarification of whether Campbell's actions constituted sexual harassment and, if so, why the Arbitrator's award does not violate public policy in light of the allegations raised by the District.

Accordingly, the order of the trial court is vacated and the matter is remanded to the trial court for further proceedings consistent with this opinion.

_____
PATRICIA A. McCULLOUGH, Judge

---

[10] Indeed, our United States Supreme Court has directed courts, in determining whether an environment is sufficiently hostile or abusive, to look at "all the circumstances," including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998) (citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993)); *see also* Section 1604.11(b) of the Regulations of the Equal Employment Opportunity Commission, 29 C.F.R. §1604.11(b) ("In determining whether alleged conduct constitutes sexual harassment, the Commission will look at the record as a whole and at the totality of the circumstances, such as the nature of the sexual advances and the context in which the alleged incidents occurred.")

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Riverview School District,                    :
                          Appellant            :
                                               :          No. 634 C.D. 2017
                    v.                         :
                                               :
Riverview Education Association,               :
PSEA/NEA                                       :

## _ORDER_

AND NOW, this 5th day of January, 2018, the order of the Court of Common Pleas of Allegheny County (trial court), dated April 12, 2017, is hereby vacated. The matter is remanded to the trial court for further proceedings consistent with this opinion.

Jurisdiction relinquished.

_____
PATRICIA A. McCULLOUGH, Judge