Joseph GIANNONE, Sr. and Rita Giannone, Individually and as Parents and Natural Guardians for Joseph Giannone, Jr., Their Minor Son

v.

AYNE INSTITUTE, et al.

No. Civ.A. 03–1718.

United States District Court, E.D. Pennsylvania.

Oct. 29, 2003.

**19.** The aforementioned revisions to Plaintiff's request for costs result in an overall deduction of $6,422.09.

554

Richard J. Silverberg & Associates, PC, Philadelphia, PA, for Plaintiff.

Lawrence M. Silverman, Silverman Bernheim & Vogel, Joseph Goldberg, Margolis Edelstein, Wendi D. Barish, Margolis Edelstein, Philadelphia, PA, for Defendants.

### MEMORANDUM

DALZELL, District Judge.

In November of 2000, Joseph Giannone, Jr., a minor, enrolled in Alldredge Academy's wilderness program. Just over two weeks later, he left the program with severe frostbite and other physical and emotional injuries. His parents, Joseph Giannone, Sr. and Rita Giannone (the "Giannones"), individually and on Joseph, Jr.'s behalf, filed a twenty-three count complaint against Alldredge, its employees, and its agents. Several of the defendants have moved to dismiss the complaint, and we here address their motions.

*Factual Background*

In late 2000, Joseph Giannone, Jr. ("Joseph") was fourteen years old and suffering from Attention Deficit Hyperactivity Disorder ("ADHD") and Tourettes Syndrome. Consolidated Am. Compl. ¶¶ 28–29. Concerned with Joseph's difficulties at school and at home, the Giannones contacted an educational consulting firm, Options for Special Kids, run by Nancy Greene. *Id.* at ¶ 33.

The Giannones met with Greene in November of 2000 to discuss how they could help their son. At this meeting, they provided Greene with Joseph's medical, psychological, and educational records. Greene reviewed these records and suggested that Alldredge Academy's wilderness program would be ideally suited for Joseph's needs. *Id.* at ¶¶ 35–38. According to Greene's description, Alldredge combined outdoor group activities, such as hiking and learning to make a fire, with intensive one-on-one psychological counseling. She also explained that Joseph would sleep in a heated shelter, or, occasionally, in a tent. *Id.* at ¶ 40.

When the Giannones balked at Alldredge's $17,000 tuition, Greene informed them that her own son had attended a similar program and suggested that they might borrow to cover the cost. *Id.* at ¶¶ 43, 45. After the Giannones decided to send Joseph to Alldredge, Greene disclosed her $2,000 fee for finding a "suitable program" for Joseph. *Id.* at ¶ 48.

On November 21, 2000, the Giannones signed Alldredge Academy's two-page, standard-form Contract, Medical Authorization, Release, and Consent Agreements (the "Contract"). In addition to an integration clause, the Contract contains seven paragraphs in which the Giannones consent to, *inter alia,* Joseph's participation in Alldredge Academy and medical treatment for him. Most relevant here, one of these paragraphs, entitled "Agreement to Arbitrate All Disputes" (the "Arbitration Clause"), provides for the resolution of "any claim of any nature and description arising out of or connected in any way with the student's participation in the program, education, counseling, or lodging, or with any other matter arising from the student's or parent's connection and agree-

ments with The Alldredge Academy." Because Joseph was a minor, the Arbitration Clause explicitly "b[ound] only . . . the Alldredge Academy and the Parent . . . of the student." Rita Giannone's signature appears after each of the Contract's seven paragraphs, including the Arbitration Clause. Both of the Giannones signed after the integration clause at the end of the Contract. Defs.' Mem. Supp. First Mot. to Dismiss Ex. B.

On or about November 29, 2000, Joseph and his father flew to West Virginia. Two Alldredge representatives, "Stan" and "Sarah", met them at the airport and for the first time informed Joseph that he would be attending a wilderness program that included hiking and backpacking. Consolidated Am. Compl. ¶ 54. Joseph left the airport with Stan and Sarah, and the trio traveled by van to a remote location. Upon arrival, Alldredge employees allegedly required Joseph to remove all of his clothing and stand barefoot in the snow while they searched for drugs and other contraband. Id. at ¶ 55. One of Alldredge's Field Supervisors, Carrie Hawkins, called the Giannones that night to inform them that Joseph's introduction to the program had gone "very well" and that the fresh snow made for a "very beautiful sight." Id. at ¶¶ 57–58.

Concerned about where her son would be sleeping at night, Rita Giannone called Greene on November 30, 2000 and asked her to confirm that Joseph would be sleeping indoors if it became too cold. After contacting Alldredge, Greene told the Giannones that Joseph would be sleeping in a heated shelter because a cold front had recently moved in. Id. at ¶¶ 62–63. On the same day, the Giannones received a letter from Michael Beswick, Alldredge's Program Director, explaining policies about contact between parents and their children and a letter from Hawkins em-

phasizing the importance of communication between parents and the program. The Giannones also received invoices from Alldredge by mail, and they made payments by mail. Id. at ¶¶ 59–61.

On or about December 6, 2000, Hawkins discovered injuries to Joseph's feet. Id. at ¶ 117–18.

Although Alldredge was scheduled to contact them on Friday, two days later, the Giannones received no phone call. On the following day, however, Greene left a message on the Giannones' answering machine to inform them that Alldredge's Director of Admissions, Glenn Bender, had reported a "medical emergency" concerning Joseph. Id. at ¶¶ 64–65. On hearing the message, Rita Giannone immediately contacted Greene and learned that Joseph's feet had become extremely discolored due to exposure to the cold and that a local doctor had diagnosed him with "Reinard's Phenomenon." Id. at ¶ 67.

After speaking with Greene, Rita Giannone contacted Alldredge and spoke with Sandra J. Schmiedeknecht, Alldredge's Medical Director. Schmiedeknecht explained that Joseph's feet had turned a "very scary" black color, but had "pinked up" after an application of warm water. Though a local doctor had concluded that Joseph was "fine," Schmiedeknecht told Mrs. Giannone that Joseph would be taken to an appointment with a rheumatologist on Monday. Schmiedeknecht refused to allow Mrs. Giannone to speak directly with Joseph. Id. at ¶¶ 71–77.

On Monday, December 11, 2000, Rita Giannone called Hawkins to discuss Joseph's rheumatologist appointment, and Hawkins promised that Schmiedeknecht would contact her. After waiting in vain for some response, Mrs. Giannone called Alldredge again, and Schmiedeknecht told her that no one had ever made an appointment for Joseph because the nearest rheu-

matologist was more than three hours away. Schmiedeknecht also refused to provide Mrs. Giannone with the phone number of the doctor who had treated Joseph. *Id.* at ¶¶ 80–83.

Unable to consult with the treating physician, Mrs. Giannone asked to speak with her son. Schmiedeknecht transferred her to Hawkins, and Hawkins initially refused to let her talk with Joseph. When Mrs. Giannone told Hawkins that she planned to remove Joseph from Alldredge, Hawkins finally promised that Joseph would call her by 10:00 p.m. The appointed hour passed, but the Giannones received no telephone call. They contacted Alldredge, and Hawkins eventually arranged for the Giannones to speak with their son. Joseph told his parents that his feet hurt and that he had lost a lot of weight. *Id.* at ¶¶ 84–90.

Joseph left Alldredge Academy on December 14, 2000 and met the Giannones at Philadelphia International Airport. Joseph could not walk without excruciating pain, so his parents used a wheelchair to transport him to their car and had to assist him into their house. Safely at home, Joseph told his parents that, at Alldredge, he had slept outside in the snow, sheltered only by a sleeping bag with a plastic cover. *Id.* at ¶¶ 91–96.

The next day, the Giannones took Joseph to the Emergency Room at Children's Hospital of Philadelphia. Joseph had lost fifteen pounds since entering All-

dredge's program, and doctors diagnosed him with bi-lateral frostbite of the feet and neuropathic pain. Joseph received pain medication and remained at the hospital overnight. Later, he was transferred to the intensive care unit. *Id.* at ¶¶ 98–104, 115.

Over the following days, Joseph began to relate some of his experiences at Alldredge to his parents. He had slept outside in the cold without any kind of heat or shelter, except for his sleeping bag. Alldredge employees berated Joseph when he asked to speak with his parents. Unable to make a fire for himself, Joseph attempted to eat "frozen" food, but the food caused him to vomit. Travis and Keith, two Alldredge employees, poured water down his throat, causing him to choke, and they poured water on his chest as a form of punishment. The wet clothing froze and stuck to Joseph's body, leaving him cold throughout the day. *Id.* at ¶¶ 108–14.

Joseph continues to suffer severe pain, mental anguish, humiliation, anxiety, and stress as a result of his time at Alldredge Academy. *Id.* at ¶ 141.

On their own behalf on behalf of Joseph, the Giannones filed a Consolidated Amended Complaint against the Alldredge Defendants,[1] the Greene Defendants,[2] and fifteen John Does. The complaint includes twenty-three counts, including thirteen counts against the Alldredge Defendants

1. The "Alldredge Defendants" are Alldredge Academy; Ayne Institute, LLC, an entity affiliated with Alldredge Academy; L. Jay Mitchell and Lance Wells, co-founders and owners of Alldredge; Glenn F. Bender, Alldredge's Director of Admissions and Marketing; Michael Beswick, Alldredge's Head of School; J. Weston White, an Alldredge employee; Ron Schwenkler, Alldredge's Director of Village; Ray Gwilliam, Alldredge's Director of Extended Stay; Tom Harvey and Carrie Hawkins, two Alldredge Wilderness Field Supervisors; Sandra J. Schmiedeknecht, Alldredge's Medical Director; Patrick O'Brien, Alldredge's Village Program Director; and four other Alldredge employees whose last names are unknown but whose given names are Stan, Sarah, Travis, and Keith.

2. The "Greene Defendants" are Nancy V. Greene, individually and trading as Options for Special Kids, and Options for Special Kids.

and eleven counts against the Greene Defendants.[3] The Giannones seek to recover from the Alldredge Defendants for violations of the Racketeer Influenced and Corrupt Organizations Act and for negligent child abuse, fraud, fraudulent misrepresentation, breach of fiduciary duty, breach of contract, assault, battery, negligence, negligent supervision, intentional infliction of emotional distress, negligent infliction of emotional distress, and civil conspiracy. Several of the Alldredge Defendants moved to dismiss the complaint on May 27, 2003,[4] and Glenn Bender filed a separate, though much the same, motion on October 10, 2003.[5] Because of their similarity, we treat the two motions to dismiss as though part of a single motion brought by all of the Alldredge Defendants.[6]

---

**3.** This apparent failure to sum is because the Giannones bring Count XXIII against all of the defendants.

**4.** The parties to this "First Motion to Dismiss" were Alldredge Academy, Ayne Institute, LLC, L. Jay Mitchell, Michael Beswick, J. Weston White, Carrie Hawkins, Sandra J. Schmiedeknecht, Ron Schwenkler, and Patrick O'Brien.

**5.** We refer to Bender's motion as the "Second Motion to Dismiss."

**6.** Despite some inconsistency with our earlier usage, *see, e.g., supra* note 1, we collectively refer to the parties to the First and Second Motions to Dismiss as the "Alldredge Defendants" throughout the remainder of this opinion.

Because it appears that the Giannones have not yet served Lance Wells, Ray Gwilliam, Tom Harvey, Stan, Sarah, Travis, Keith, and the fifteen John Does, we will dismiss without prejudice all claims against them, unless the Giannones can show good cause for their failure to serve by November 17, 2003. *See* Fed.R.Civ.P. 4(m).

**7.** Alternatively, the Alldredge Defendants contend that the Arbitration Clause's existence makes the Giannones' pleading defective. *See, e.g.,* First Mot. to Dismiss ¶ 19, at 6 (arguing for dismissal for "failure to set forth

## Analysis

The motions seek the dismissal of all of the Giannones' individual claims and many of their claims as Joseph's representative. At the outset, the Alldredge Defendants argue that the Arbitration Clause divests this Court of subject matter jurisdiction over the Giannones' individual claims.[7] The Alldredge Defendants also request that we dismiss several of the counts for failure to state claims upon which relief could be granted.

### A. The Arbitration Agreement

According to the Alldredge Defendants, we should dismiss all of the Giannones' individual claims because their agreement to arbitrate "any claim ... arising out of [Joseph's] participation" in Alldredge Academy's program[8] deprives us of sub-

---

a claim upon which relief can be granted"). Assuming, however, that the complaint is otherwise sufficient, the fact that such a clause exists would not doom any of the Giannones' claims. Thus, we hold that the Arbitration Clause's existence, by itself, does not entitle the Alldredge Defendants to Rule 12(b)(6) dismissal of the claims that the Giannones assert on their own behalf.

**8.** We recognize that the Contract on which the Alldredge Defendants rely was not attached to the complaint, so it is somewhat unusual for us to consider it when ruling on filings styled as "motions to dismiss." *But cf. infra* note 9 (characterizing the motion as one to compel arbitration). Still, we may consider "an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Pension Ben. Guar. Corp. v. White Consol. Industries, Inc.,* 998 F.2d 1192, 1196 (3d Cir.1993). The Giannones concede the Contract's authenticity, *see* Pls.' Mem. Opp. Mot. to Dismiss at 14 (admitting that "they signed" the Contract), and they appear to assert a claim for the Alldredge Defendants' breach of the Contract, *compare* Consolidated Am. Compl. ¶ 173 (referring to "a" single "contractual agreement") *with* Pls.' Mem. Opp. Mot. to Dismiss at 14 (referring to the Contract as that "agreement"). In

ject matter jurisdiction.[9] *See* Defs.' Mem. Supp. First Mot. to Dismiss at 11–14. The Giannones, on the other hand, argue that the Contract—including the Arbitration Clause—is void because their assent was procured by fraud in the factum. Specifically, they assert that the Alldredge Defendants and their agent misrepresented, among other things, that Alldredge Academy offered a "therapeutic program to help [the Giannones'] disabled child," when the program was actually a "boot camp where their son was intentionally abused and neglected." *See* Pls.' Mem. Opp. Mot. to Dismiss at 19.

We begin with the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–16 (2003), the statute "creat[ing] a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 26 n. 32, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). Collectively, the FAA's provisions embody a "liberal federal policy favoring arbitration agreements [that] is at bottom a policy guaranteeing the enforcement of private contractual arrangements." *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 625, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985) (quotation and citation omitted).

Notwithstanding this policy, arbitrators "derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration." *AT & T Techs., Inc. v. Communications Workers*, 475 U.S. 643, 648–49, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986). Thus, arbitration remains "a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). Taking these considerations into account, Section 4 of the FAA requires courts to "make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement," provided that they are "satisfied that the making of the agreement for arbitration ... is not in issue." 9 U.S.C. § 4 (2003).

The Supreme Court construed Section 4 in *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967). There, Prima Paint and F & C had entered a consulting agreement, which included a clause providing for arbitration of "[a]ny controversy or claim arising out of or relating to" the agreement. *Id.* at 398, 87 S.Ct. 1801. Shortly after Prima Paint executed the agreement, F & C filed for bankruptcy. After learning of the filing, Prima Paint refused to pay F & C the money due under the consulting agreement because it claimed that "F & C had fraudulently represented that it was solvent and able to perform its contractual obligations, where ... it was in fact insolvent and intended to

---

addition, they did not challenge the Alldredge Defendants' reliance on the Contract in their motion to dismiss. Thus, as the question is not in dispute, we shall consider the Contract while resolving the motions before us now.

9. Though styled as a motion to dismiss for want of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), we treat the portion of the Alldredge Defendants' motion addressing the Arbitration Clause as a motion to stay this action and to compel arbitration pursuant to Sections 3 and 4 of the Federal Arbitration Act, 9 U.S.C. § 4 (2003). Our Court of Appeals has recognized the functional equivalence of dismissing an action and directing the parties to proceed to arbitration. *See Seus v. John Nuveen & Co.*, 146 F.3d 175, 179 (3d Cir.1998); *see also Dancu v. Coopers & Lybrand*, 778 F.Supp. 832, 835 (E.D.Pa.1991), *aff'd*, 972 F.2d 1330 (3d Cir. 1992).

file a [bankruptcy] petition." *Id.* In response, F & C initiated arbitral proceedings against Prima Paint, and Prima Paint petitioned a federal district court to enjoin the arbitration. F & C cross-moved for a stay of the federal action pending arbitration. The district court granted F & C's motion to stay the action, and the Supreme Court affirmed that an arbitrator should decide whether fraud vitiated the contract. *Id.* at 399–401, 87 S.Ct. 1801.

■ In reaching this result, the Court emphasized language in Section 4 referring to the "making of the agreement *for arbitration.*" 9 U.S.C. § 4 (emphasis added). The final prepositional phrase requires the severance of consideration of an arbitration clause from the rest of the contract:

> [I]f the claim is fraud in the inducement of the arbitration clause itself—an issue which goes to the "making" of the agreement to arbitrate—the federal court may proceed to adjudicate it. But the statutory language does not permit the federal court to consider claims of fraud in the inducement of the contract generally. . . . We hold, therefore, that . . . a federal court may consider only issues relating to the making and performance of the agreement to arbitrate.

*Id.* at 403–404, 87 S.Ct. 1801. In short, *Prima Paint* held that courts should adjudicate issues involving fraud in the inducement of an arbitration clause, but arbitrators should determine whether there has been fraud in the inducement of an entire contract.

Our Court of Appeals addressed a similar situation in *Sandvik AB v. Advent Int'l Corp.,* 220 F.3d 99 (3d Cir.2000). In that case, Advent negotiated an agreement to purchase interests in three of Sandvik's subsidiaries. The agreement included an arbitration clause mandating arbitration of "[a]ny dispute arising out of or in connection with" the agreement. Ralf Huep signed the agreement on Advent's behalf, but Advent later repudiated the entire contract, including the arbitration clause, claiming that Huep lacked proper authorization to enter into it. *Id.* at 101. Sandvik brought suit in federal district court, and Advent moved to compel arbitration. The district court denied Advent's motion, and the Third Circuit affirmed the lower court's decision to rule on the contract's validity before enforcing the arbitration clause.

Despite *Prima Paint'*s preference for arbitration, the Third Circuit used the theoretic distinction between void and voidable contracts to uphold the district court's decision. *See Sandvik,* 220 F.3d at 107 ("[W]e draw a distinction between contracts that are asserted to be 'void' or non-existent . . . and those that are merely 'voidable,' as was the contract at issue in *Prima Paint.*"). After observing that *"Prima Paint's* holding addressed the effect of fraud in the inducement claims," our Court of Appeals noted that the Supreme Court "did not grapple with what is to be done when a party contends not that the underlying contract is merely voidable, but rather than no contract ever existed." *Id.* at 105. Seizing on this opportunity, the Court of Appeals held that "when the very existence of . . . an agreement [to arbitrate] is disputed, a district court is correct to refuse to compel arbitration until it resolves the threshold question of whether the arbitration agreement exists." *Id.* at 112.

■ Read together, *Sandvik* and *Prima Paint* require a complex analysis of any challenge to the enforceability of an arbitration agreement.[10] First, the Court

---

10. As we engage in this analysis, we rely on federal law. *See Goodwin v. Elkins & Co.,*

must decide whether the challenger claims that the agreement is void[11] or merely voidable.[12] If the challenger contends that it is void, then *Sandvik* permits the Court to determine its actual validity. If, on the other hand, the challenger asserts that the agreement is voidable, then *Prima Paint* requires further characterization because the Court resolves only challenges to an arbitration clause within a broader contract. An arbitrator decides global issues related to the agreement as a whole.

In this case, the Giannones claim that the Alldredge Defendants and their agent fraudulently misrepresented that Alldredge Academy offered "a therapeutic program to help their disabled child" when it was actually "a boot camp where their son was intentionally abused and neglected." Pls.' Mem. Opp. Mot. to Dismiss at 19. They characterize such misrepresentations as fraud in the factum that renders "the entire contract, including the arbitration provision, ... void *ab initio.*" *Id.* While the Giannones' assertions clearly raise questions about whether the Alldredge Defendants acted fraudulently, we must look deeper into the precise nature of the fraud they identify because the type of fraud alleged is highly consequential to out resolution of the motions to dismiss.

Courts "classically" distinguish between two types of fraud, fraud in the factum and fraud in the inducement. 26 Samuel Williston, *A Treatise on the Law of Contracts* § 69:4 (Richard A. Lord ed., 4th ed.1990); *see also* 7 Arthur Linton Corbin, *Corbin on Contracts* § 28.22 (Joseph M. Perillo ed., rev. ed.1993) (distinguishing between fraud in the factum and fraud in the inducement). In cases where one party's assent has been procured by fraud in the factum, courts treat the agreement as void and legally ineffective. *See, e.g., Resolution Trust Corp. v. Koock,* 867 F.Supp. 284, 287 (E.D.Pa.1994) (Robreno, J.) ("[F]raud in the factum ... would render the [agreement] void ...."); *see also* Restatement (Second) of Contracts § 163 (1981). When, however, there is fraud in the inducement, the agreement is voidable at the option of the defrauded party. *See, e.g., Langley v. FDIC,* 484 U.S. 86, 94, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987) (recognizing that "fraud in the inducement ... renders [a contract] voidable but not void"); *see also* Restatement (Second) of Contracts § 164 (1981).

Despite the "metaphysical ring" of the fraud-in-the-factum/fraud-in-the-inducement distinction, *see Sphere Drake Ins. Ltd. v. Clarendon Nat'l Ins. Co.,* 263 F.3d 26, 31 (2d Cir.2001), it carries practical significance here. If the Giannones allege fraud in the factum, then *Sandvik* allows

730 F.2d 99, 108 (3d Cir.1984) ("[F]ederal law applies in construing and enforcing an arbitration clause ....").

11. A void agreement is one with a "total absence of legal effect," 1 Arthur Linton Corbin, *Corbin on Contracts* § 1.7 (Joseph M. Perillo ed., rev. ed.1993), or one "which produces no legal obligation." 1 Samuel Williston, *A Treatise on the Law of Contracts* § 1:20 (Richard A. Lord ed., 4th ed.1990). *See also* Restatement (Second) of Contracts § 7 cmt. a (1981) ("A promise for breach of which the law neither gives a remedy nor otherwise recognizes a duty of performance by the promisor is often called a void contract.")

12. A voidable agreement "is, to some extent, legally operative," but at least one of the parties usually possesses both "a power to avoid [its legal effect] and a power to validate [that effect] by ratification." 1 Arthur Linton Corbin, *Corbin on Contracts* § 1.6 (Joseph M. Perillo ed., rev. ed.1993). *See also* Restatement (Second) of Contracts § 7 (1981) ("A voidable contract is one where one or more parties have the power, by a manifestation of election to do so, to avoid the legal relations created by the contract, or by ratification of the contract to extinguish the power of avoidance.").

the Court to decide whether the contract is void. On the other hand, *Prima Paint* requires us to refer to an arbitrator allegations of fraud in the contract's inducement that would render it voidable.

Fraud in the factum occurs when "fraud ... procures a party's signature to an instrument without knowledge of its true nature or contents." *FDIC v. Deglau*, 207 F.3d 153, 171 (3d Cir.2000) (quoting *Langley v. FDIC*, 484 U.S. 86, 93, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987)); *see also* Restatement (Second) of Contracts § 163 & cmt. a (1981) (defining fraud in the factum as "a misrepresentation as to the character or essential terms of a proposed contract"). "Fraud in the inducement, on the other hand, does not involve terms omitted from an agreement, but rather allegations of oral representations on which the other party relied in entering into the agreement but which are contrary to the express terms of the agreement." *Dayhoff Inc. v. H.J. Heinz Co.*, 86 F.3d 1287, 1300 (3d Cir.1996); *see also* Restatement (Second) of Contracts § 164.

Using these definitions, one could reasonably argue that the Alldredge Defendants' alleged misrepresentations (*i.e.*, describing a program as therapeutic for a disabled child when it was really a "boot camp") constitute either kind of fraud. The Giannones argue that the misrepresentations were fraud in the factum because they involved the contract's "essential terms," *see* Pls.' Mem. Opp. Mot. to Dismiss at 19, but the misrepresentation could also be seen as fraud in the inducement. To resolve this issue, we look to the ancient roots of the distinction between fraud in the factum and fraud in the inducement.

In medieval England, plaintiffs initiated contract litigation by obtaining writs of covenant or debt sur obligation. Kevin M. Teeven, *A History of the Anglo–American Common Law of Contract* 6–8 (1990). These actions lay only when a sealed instrument memorialized the transaction at issue, and—when such formalities were observed—the common law courts required defendants to honor the contract, unless they pled and proved the defense of *non est factum* ("not his deed"). *See* Clinton W. Francis, *The Structure of Judicial Administration and the Development of Contract Law in Seventeenth–Century England*, 83 Colum. L.Rev. 35, 91–92 (1983). A *non est factum* plea asserted that the sealed instrument did not bind the defendant because the defendant had not actually signed it (*i.e.*, his signature had been forged) or because he "signed an instrument that [was] radically different from that which he was led to believe." 7 Arthur Linton Corbin, *Corbin on Contracts* § 28.22 (Joseph M. Perillo ed., rev. ed.1993).

For example, the English Common Pleas court considered a case arising out of a debt that Chicken owed to Thoroughgood, who was "not lettered". After someone told him that it would release Chicken's debt, Thoroughgood signed a document that was actually a deed giving Chicken a limited right to use some of Thoroughgood's land. The court held that "if the effect [of a writing] be declared to him in other form than is contained in the writing ... he shall avoid the deed." *Thoroughgood v. Cole*, 76 Eng. Rep. 408, 410 (1582). In modern parlance, the deed was void because misstating the contents of a document to an illiterate constitutes fraud in the factum.

Though the common law courts upheld pleas of *non est factum* when the "party was misled into misunderstanding the essential nature of what he was doing," Bernard E. Gegan, *Turning Back the Clock on the Trial of Equitable Defenses in New York*, 68 St. John's L.Rev. 823, 843 (1994),

they refused to recognize a more general fraud defense, *see* James Barr Ames, *Specialty Contracts and Equitable Defences,* 9 Harv. L.Rev. 49, 51 (1895–1896). A court of equity, on the other hand, would "grant a permanent unconditional injunction against an action upon a speciality got by fraud." *Id.* For instance, when a seller claimed that a jewel was worth £360 and the buyer signed a promissory note in payment for it, the Chancellor decreed that the note could not be enforced after the buyer discovered that the jewel was worth only £20, even though the common law courts had already enforced it.[13] *Courtney v. Glanvil,* 79 Eng. Rep. 294 (K.B.1615).

Despite the relatively recent merger of law and equity, modern courts have continued to distinguish between fraud in the factum and fraud in the inducement. Courts find fraud in the factum only in rare cases, such as those involving forgery, *see, e.g., Resolution Trust Corp. v. Forlini,* Nos. 91–3215, 91–3216, 91–3610, 91–3612, 91–3613, 91–3615, 1991 WL 259742, 1991 U.S. Dist. LEXIS 17626, *8 (E.D.Pa. Dec. 12, 1991) (Newcomer, J.) ("Forgery is fraud in factum and not fraud in the inducement."), or where one party "surreptitiously substitutes a materially different contract" after the parties had agreed to language in earlier drafts, *see, e.g., Connors v. Fawn Mining Corp.,* 30 F.3d 483, 493 (3d Cir.1994).

On the other hand, most contemporary cases dealing with contractual fraud involve claims of fraud in the inducement. In *Langley v. FDIC,* 484 U.S. 86, 94, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987), for example, the Supreme Court explained that a bank's alleged misrepresentations about the acreage and mineral interests conveyed in a land sale transaction would constitute only fraud in the inducement, not fraud in the factum. Similarly, this Court has held that the plaintiffs had not pled fraud in the factum when they alleged that the defendant told them that demand notes were not payable for at least ten years. *Alten v. T.A.E.I., Inc.,* No. 87–8343, 1993 WL 53566, 1993 U.S. Dist. LEXIS 2639, *11–12 (E.D.Pa. Mar. 3, 1993) (J.M. Kelly, J.). Another "classic case" of fraud in the inducement arose when the buyer of a portfolio of debt alleged that the seller misrepresented the portfolio's value. *Capital Funding, VI, LP v. Chase Manhattan Bank USA, N.A.,* No. 01–6093, 2003 WL 21672202, 2003 U.S. Dist. LEXIS 12102, *8 (E.D.Pa. Mar. 21, 2003) (Davis, J.). Indeed, fraud in the inducement cases usually involve allegations that one party painted a "false picture" of how the contract would operate. *See, e.g., Straight Arrow Prods. v. Conversion Concepts, Inc.,* No. 01–221, 2001 WL 1530637, 2001 U.S. Dist. LEXIS 19859, at *14 n. 7 (E.D.Pa. Dec. 4, 2001) (Waldman, J.).

With these ancient and modern precedents providing the necessary context, we conclude that, despite their attempt to characterize it otherwise, the Giannones have alleged fraud in the inducement, not fraud in the factum. They claim that the Alldredge Defendants and their agent fraudulently misrepresented that Alldredge Academy offered "a thera-

---

**13.** This disparate treatment of the same contract by different courts also explains the distinction between void and voidable contracts. The common law courts would decide whether sealed instruments were valid or void, but litigants could, in certain circumstances, petition the Chancellor for an injunction against enforcement of a valid instrument. In such situations, the valid instrument would be "voidable," though not void. For an informative discussion of the power struggles between the courts of law and equity, see generally John P. Dawson, *Coke and Ellesmere Disinterred: The Attack on the Chancery in 1616,* 36 Ill. L.Rev. 127 (1941–1942).

peutic program to help their disabled child" when it was actually "a boot camp where their son was intentionally abused and neglected," Pls.' Mem. Opp. Mot. to Dismiss at 19, but this allegation focuses on how the Alldredge Defendants promised them one type of program and actually did something very different. Fraud in the factum, however, involves a misrepresentation about the fundamental character of the contract itself, not merely about the quality of the consideration received. If the Giannones had signed a document purporting to renounce their parental rights when the Alldredge Defendants told them that they were merely consenting to Joseph's participation in an outdoors program, then they might have raised an issue of fraud in the factum. The misrepresentation alleged here, however, amounts only to fraud in the inducement that would, if proven, render the Contract voidable—not void.

Where, as here, the party seeking to avoid arbitration alleges fraud that would render a contract voidable, the *Prima Paint* severability doctrine applies.[14] Thus, we turn now to the question of whether the alleged fraud induced assent to the entire contract or only to the arbitration clause. The Giannones have not claimed that the alleged fraud induced them to agree to arbitrate claims against the Alldredge Defendants. Rather, they assert that the fraud affects the validity of "the *entire* contract, including the arbitration provision." Pls.' Mem. Opp. Mot. to Dismiss at 19 (emphasis added). Because *Prima Paint*, 388 U.S. at 403–04, 87 S.Ct. 1801, requires us to allow an arbitrator to decide if the alleged fraud induced assent to the Contract, we will dismiss the Giannones' individual claims against the Alldredge Defendants and order them to submit those claims to arbitration, if they so choose.[15]

## B. *Sufficiency of the Representative Claims*

Though the Giannones must arbitrate their individual claims against the Alldredge Defendants, they also assert thirteen claims on Joseph's behalf. Pursuant to Fed.R.Civ.P. 12(b)(6), the Alldredge Defendants have moved to dismiss many of these representative claims for failure to state claims upon which relief may be granted.[16]

---

**14.** We cannot resist noting the irony in how a distinction created by sixteenth-century courts of equity to attract cases from the courts of law provided the opportunity for the federal courts to deflect adjudicatory responsibility onto arbitrators.

**15.** Before the arbitrator, the Giannones may argue that the entire Contract, including the Arbitration Clause, is voidable under a fraud-in-the-inducement theory. If the arbitrator decides that fraud vitiated their assent to the Arbitration Clause, then he or she should allow the Court to reach the merits of their claims. On the other hand, if the arbitrator concludes that the Arbitration Clause binds the Giannones, then he or she may resolve those claims.

**16.** The Court may grant a motion to dismiss under Rule 12(b)(6) "only if, accepting all well pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir.1997). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). In other words, we will not grant such a motion "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *see also Semerenko v. Cendant Corp.*, 223 F.3d 165, 173 (3d Cir. 2000) (permitting dismissal "only if it appears that the [plaintiffs] could prove no set of facts that would entitle [them] to relief"). "The complaint will be deemed to have alleged

5

1. *Count I: RICO*

In Count I, the Giannones allege that the Alldredge Defendants violated the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968 (2003). *See* Consolidated Am. Compl. ¶¶ 121–42, at 20–28. RICO permits "[a]ny person injured in his business or property by reason of a violation of section 1962" to bring a civil action in federal court. 18 U.S.C. § 1964(c). While the parties focus on whether the Giannones adequately pled violations of Section 1962, *see* Defs.' Mem. Supp. First Mot. to Dismiss at 14–17; Pls.' Mem. Opp. Mot. to Dismiss at 21–32, they fail to address whether the complaint alleges that Joseph suffered an injury to "his business or property" that would entitle his parents to assert a RICO claim on his behalf.

■ The complaint alleges that Joseph suffered severe physical and emotional injuries and irreparable harm to his relationship with his parents. *See* Consolidated Am. Compl. ¶¶ 137, 141. Though certainly significant, these personal injuries cannot sensibly be said to relate to Joseph's business or property. *Genty v. Resolution Trust Corp.*, 937 F.2d 899, 918–19 (3d Cir. 1991) ("RICO plaintiffs may recover damages for harm to business and property only, not physical and emotional injuries . . ."); *see also Oscar v. Univ. Students Co-op. Ass'n*, 965 F.2d 783, 785–86 (9th Cir.1992) ("[I]t is clear that personal injuries are not compensable under RICO."); *Rylewicz v. Beaton Services, Ltd.*, 888 F.2d 1175, 1180 (7th Cir.1989) ("18 U.S.C. § 1964(c), would not permit the [plaintiffs] to recover for personal injuries. . . ."); *Grogan v. Platt*, 835 F.2d 844, 847 (11th Cir.1988) ("In our view, the ordinary meaning of the phrase 'injured in his business or property' excludes personal injuries, including the pecuniary losses therefrom."); *Drake v. B.F. Goodrich Co.*, 782 F.2d 638, 643–44 (6th Cir.1986) (finding that RICO does not apply to personal injury claims).

Because Count I of the complaint fails to allege injury to Joseph's "business or property," we will dismiss Joseph's RICO claim.

2. *Counts III and XI: Negligent Child Abuse and Negligent Supervision*

In addition to their general allegations of negligence in Count X, the Giannones bring separate causes of action for negligent child abuse and negligent supervision in Counts III and XI, respectively. The Alldredge Defendants request that we dismiss the more specific allegations of negligence in Counts III and XI because Count X encapsulates them and makes them redundant. *See* Defs.' Mem. Supp. First Mot. to Dismiss at 27. In response, the Giannones boldly assert that each of these claims involve "different facts and legal principles," *see* Pls.' Mem. Opp. Mot. to Dismiss at 50, without identifying any case law recognizing separate claims for negligent child abuse and/or negligent supervision, and without specifying how the legal

sufficient facts if it adequately put the defendants on notice of the essential elements of the plaintiffs' cause of action." *Nami v. Fauver*, 82 F.3d 63, 65 (3d Cir.1996).

Even if the allegations are insufficient by themselves, we will still deny a motion to dismiss so long as the allegations "in addition to inferences drawn from those allegations, provide a basis for recovery." *Menkowitz v. Pottstown Mem'l Med. Ctr.*, 154 F.3d 113, 124–125 (3d Cir.1998); *see also Scheuer*, 416 U.S. at 236, 94 S.Ct. 1683 ("[T]he allegations of the complaint should be construed favorably to the pleader."); *Emerson v. Thiel College*, 296 F.3d 184, 188 (3d Cir.2002) ("A complaint will withstand an attack under Federal Rule of Civil Procedure 12(b)(6) if the material facts as alleged, in addition to inferences drawn from those allegations, provide a basis for recovery.").

principles governing such claims differ from those covering general negligence. They also claim that dismissing Counts III and XI would "prejudice [them] if stricken," but they fail to specify the nature or degree of that prejudice. *Id.* at 50 n. 15.

██ In Pennsylvania,[17] "[t]he necessary elements to maintain an action in negligence are: a duty or obligation recognized by the law, requiring the actor to conform to a certain standard of conduct; a failure to conform to the standard required; a causal connection between the conduct and the resulting injury and actual loss or damage resulting to the interests of another." *Morena v. South Hills Health System*, 501 Pa. 634, 642 n. 5, 462 A.2d 680, 684 n. 5 (1983). To the extent that Pennsylvania recognizes it, the tort of negligent supervision appears as a particular kind of negligence, that is, negligence predicated upon a breach of a duty to supervise. *See, e.g., K.H. & D.A.H. v. J.R. & N.R.*, 573 Pa. 481, 826 A.2d 863, 872–875 (2003). Our research has failed to unearth any Pennsylvania case recognizing a distinct civil cause of action for negligent child abuse.

In short, Pennsylvania courts do not distinguish between general negligence and either negligent supervision or negligent child abuse. Because we find claims for these latter claims to be duplicative of the former, we will dismiss Counts III and XI of the Giannones' complaint. *See also Post v. Hartford Life & Accident Ins. Co.*, No. 02–1917, 2002 WL 31741470, 2002 U.S. Dist. LEXIS 23384, at *16 (E.D.Pa. Dec. 6, 2002) (R. Kelly, S.J.) (dismissing one of two "substantively identical" counts in the same complaint); *Specialty Ins. v. Royal Indem. Co.*, No. 00–2482, 2002 U.S. Dist. LEXIS 12203, at *19 (E.D.Pa. Mar. 25, 2002) (Surrick, J.) (dismissing count that was "nothing more than a duplication" of another count); *Caudill Seed & Warehouse Co. v. Prophet 21, Inc.*, 123 F.Supp.2d 826, 834 (E.D.Pa.2000) (Reed, S.J.) (dismissing count that "merely duplicates" another count); *American Trade Partners, L.P. v. Pegkar Int'l, Inc.*, No. 90–4204, 1991 WL 170253, 1991 U.S. Dist. LEXIS 11940, at *8 (E.D.Pa. Aug. 28, 1991) (Waldman, J.) (same).[18]

### 3. Counts IV and V: Fraud and Fraudulent Misrepresentation

The Giannones also assert claims of fraud and fraudulent misrepresentation. Because both parties treat these causes of action as identical, *see* Defs.' Mem. Supp. First Mot. to Dismiss at 23–24 (describing them as "duplicative"); Pls.' Mem. Opp. Mot. to Dismiss at 41 (explaining that they are defined by identical elements), we consider these claims together.

Under Pennsylvania law, fraud consists of "the following elements: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury

---

**17.** We apply Pennsylvania law to Counts III through XIII and to Count XXIII because the parties implicitly agree that Pennsylvania law controls resolution of those claims by citing only Pennsylvania precedents in their briefs. Under *Klaxon*, this assumption seems to us unwarranted in view of all of the pertinent conduct to these tort claims having occurred in West Virginia, but in an effort to avoid further arcane analysis, we shall take the parties' citations as their waiver of West Virginia authority.

**18.** In pressing the negligence claim as Joseph's representatives, the Giannones may attempt to prove that the Alldredge Defendants abused Joseph and failed to supervise him adequately.

was proximately caused by the reliance." *Gibbs v. Ernst,* 538 Pa. 193, 207, 647 A.2d 882, 889 (1994). The parties contest whether the Giannones have pled this cause of action with sufficient particularity to comply with Fed.R.Civ.P. 9(b), *see* Defs.' Mem. Supp. First Mot. to Dismiss at 22–24; Pls.' Mem. Opp. Mot. to Dismiss at 41–44, but we discern another fatal defect.

While the Giannones allege that the Alldredge Defendants made many misrepresentations to them, *see, e.g.,* Consolidated Am. Compl. ¶¶ 38, 63, an arbitrator will decide whether they were personally defrauded, *see supra* Part A. We deal now only with the claims the Giannones brought on Joseph's behalf. In this regard, the complaint fails to allege even that the Alldredge Defendants made a representation to Joseph, much less that one was misleading, false, intended to injure, and justifiably relied upon.

Because the Giannones have not alleged sufficient facts to make out a claim that the Alldredge Defendants defrauded Joseph, we will dismiss the claims for fraud and fraudulent misrepresentation.

### 4. *Count VI: Breach of Fiduciary Duty*

In Count VI, the Giannones claim that the Alldredge Defendants breached their fiduciary duties to Joseph. Specifically, they allege that "[d]efendants, all of them, were in a fiduciary relationship and/or stood *in loco parentis* with Joseph, and as hereinbefore set forth, breached their duty to Joseph which directly and/or proximately caused Joseph to suffer severe and permanent personal injuries." Consolidated Am. Compl. ¶ 171.

The Alldredge Defendants disparage this pleading as a "fail[ure] to allege any specifics regarding the nature of the relationship between Joseph ... and each of the [Alldredge] Defendants," Defs.' Mem.

Supp. First Mot. to Dismiss at 25–26, but the Giannones needed only to include "a short and plain statement of the claim showing that [they are] entitled to relief." Fed.R.Civ.P. 8(a)(2). We hold that the Giannones have adequately alleged sufficient facts to state a claim for breach of fiduciary duty because "the liberal opportunity for discovery and the other pretrial procedures established by the Rules" afford the Alldredge Defendants an opportunity to establish "more precisely the basis of both claim and defense and to define more narrowly the disputed facts and issues." *Conley v. Gibson,* 355 U.S. 41, 47–48, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *see also In re Catanella,* 583 F.Supp. 1388, 1401 (E.D.Pa.1984) (Giles, J.) (denying motion to dismiss breach of fiduciary duty claim).

Thus, we will allow the Giannones to proceed with Count VI on Joseph's behalf.

### 5. *Count VII: Breach of Contract*

Count VII purports to state a cause of action for breach of contract. In their briefs, the parties discuss whether the individual Alldredge Defendants may be held liable for breaching a contract to which they were not parties. *See* Defs.' Mem. Supp. First Mot. to Dismiss at 26; Pls.' Mem. Opp. Mot. to Dismiss at 47–49. These arguments, however, focus on liability for breaching a contract between the Giannones and the Alldredge Defendants, an issue that we leave to the arbitrator, *see supra* Part A.

We address now only whether the Giannones, as Joseph's representatives, have stated a claim for breach of contract between Joseph and the Alldredge Defendants. This question need not detain us long, for the complaint never alleges that Joseph entered into any contract whatsoever. *Cf. CoreStates Bank, N.A. v. Cutil-*

*lo*, 723 A.2d 1053, 1058 (Pa.Super.Ct.1999) (explaining that a plaintiff must prove, inter alia, "the existence of a contract" to prevail on a breach of contract claim).

We shall, therefore, dismiss Count VII of the complaint.

### 6. *Counts VIII and IX: Assault and Battery*

The Giannones seek to recover for assault in Count VIII of the complaint and for battery in Count IX. The Pennsylvania Supreme Court has defined battery as "a harmful or offensive contact," *Dalrymple v. Brown*, 549 Pa. 217, 229, 701 A.2d 164, 170 (1997), and assault as "an act intended to put another person in reasonable apprehension of an immediate battery, and which succeeds in causing an apprehension of such battery," *Cucinotti v. Ortmann*, 399 Pa. 26, 27, 159 A.2d 216, 217 (1960). In this case, the parties agree that the Giannones have alleged sufficient facts to state valid causes of action for assault and battery against Keith and Travis. *See* Defs.' Mem. Supp. First Mot. to Dismiss at 18–19; Pls.' Mem. Opp. Mot. to Dismiss at 33–34. The other Alldredge Defendants, however, argue that they may not be held vicariously liable for intentional torts that Keith and Travis committed.

 Alldredge Academy asserts that it is not responsible for the torts of Keith and Travis because those torts were committed outside the scope of their employment. *See* Defs.' Mem. Supp. First Mot. to Dismiss at 20–21. While an employer certainly is not liable for the torts an employee commits while acting outside the scope of his employment, *Pilipovich v. Pittsburgh Coal Co.*, 314 Pa. 585, 589, 172 A. 136, 137 (1934), only the fact finder may decide whether an employee actually acted within the scope of his employment, *Orr v. William J. Burns Int'l Detective Agency*, 337 Pa. 587, 592, 12 A.2d 25, 27 (1940). The Giannones have alleged that Keith and Travis acted within the scope of their employment, *see* Consolidated Am. Compl. ¶ 22, so we will not dismiss the claims for assault and battery against Alldredge Academy.[19]

The remaining Alldredge Defendants contend that the Giannones "have not alleged any act on [their] part ... which would give rise to ... claims" for assault and battery. Defs.' Mem. Supp. First Mot. to Dismiss at 21. The Giannones suggest, however, that Pennsylvania courts recognize a "concert of action" theory which imposes vicarious liability on "all persons counseling, abetting, plotting, assenting, consenting and encouraging the committing of the assault and battery." Pls.' Memo. Opp. Mot. to Dismiss at 38. After reviewing the authorities cited in their brief, we cannot agree.

Only one modern Pennsylvania court has recognized a concert-of-action theory. In that case, the Court of Common Pleas for Dauphin County based its opinion exclusively on a dusty decision of the state Supreme Court. *See Keich v. Frost*, 63 Pa. D. & C.2d 499, 501 (C.C.P. Dauphin Cty.1973) (quoting *Frantz v. Lenhart*, 56 Pa. 365 (1867)). Moreover, the Court of Common Pleas relied only on the portion of the Supreme Court's opinion that quoted a trial judge's jury instruction. To be sure, the Supreme Court affirmed the jury's verdict, but its holding that the trial judge did not commit reversible error offers only the most tenuous support for the Giannones' theory. Essentially, they have cited a portion of jury instruction given

---

**19.** For the same reasons, we will not dismiss the claims for assault and battery against Ayne Institute, LLC.

once—more than a century ago—by a single Pennsylvania trial judge as the definitive statement of Pennsylvania law on concert-of-action.

 Although some courts may "believe [ ]" otherwise, *see Shoop v. Dauphin County,* 766 F.Supp. 1323, 1326 (M.D.Pa. 1990), we predict that the Pennsylvania Supreme Court would recognize no concert-of-action theory that would entitle the Giannones to recover from any of the other individual Alldredge Defendants for assault and battery committed by Travis and Keith.

Still, the other individual Alldredge Defendants could be liable if they personally assaulted or battered Joseph. The Giannones have alleged that all of the "[d]efendants" committed these torts, *see* Consolidated Am. Compl. ¶¶ 175, 177 (emphasis added). In light of the earlier descriptions of Joseph's injuries, *see id.* ¶ 141, these allegations are specific enough to preclude dismissing the claims for assault and battery against any of the Alldredge Defendants.

### 7. Count XII: Intentional Infliction of Emotional Distress

In Count XII, the Giannones attempt to recover for intentional infliction of emotional distress. The Pennsylvania Supreme Court has not been inclined to specify the elements of this tort, *See Hoy v. Angelone,* 554 Pa. 134, 720 A.2d 745, 753 n. 10 (1998), but it has approved of a lower court's explanation that the conduct at issue "must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Id.* at 754 (quoting *Buczek v. First Nat'l Bank,* 366 Pa.Super. 551, 531 A.2d 1122, 1125 (1987)). "[I]t is for the court to determine if the defendant's conduct is so extreme as to

permit recovery." *Cox v. Keystone Carbon Co.,* 861 F.2d 390, 395 (3d Cir.1988) (applying Pennsylvania law).

 At this stage of the proceedings, we cannot hold that the Alldredge Defendants did not act outrageously, so we will allow the claim for intentional infliction of emotional distress to proceed. *See also Hatchigian v. Hartford Ins. Co.,* No. 03–3252, 2003 U.S. Dist. LEXIS 15666, at *14 (E.D.Pa. Aug. 13, 2003) (Buckwalter, J.) (denying a motion to dismiss because it was "too early to determine whether Defendant's conduct was so extreme and outrageous as to support an emotional distress claim").

### 8. Count XIII: Negligent Infliction of Emotional Distress

The Alldredge Defendants move for dismissal of Count XIII's claim for negligent infliction of emotional distress because they claim that the Giannones have "failed to allege the requisite elements to proceed" with that claim. Defs.' Mem. Supp. First Mot. to Dismiss at 30. Under Pennsylvania law, a plaintiff may recover for negligent infliction of emotional distress when he "sustains bodily injuries, even though trivial or minor in character, which are accompanied by fright or mental suffering directly traceable to the peril in which the defendant's negligence placed the plaintiff. . . ." *Potere v. Philadelphia,* 380 Pa. 581, 589, 112 A.2d 100, 104 (1955).

 The complaint clearly alleges that Joseph sustained bodily injuries, *see, e.g.,* Consolidated Am. Compl. ¶ 141, and it also states that the "[d]efendants [']" negligence "led to . . . [Joseph's] severe emotional distress," *id.* at ¶ 187 (emphasis added). These allegations state a claim upon which relief may be granted, so we will not dismiss the cause of action for negligent infliction of emotional distress.

### 9. *Count XXIII: Civil Conspiracy*

■ The final count in the Giannones' complaint asserts the existence of a civil conspiracy including the Alldredge and Greene Defendants. "To prove a civil conspiracy, it must be shown that two or more persons combined or agreed with intent to do an unlawful act or to do an otherwise lawful act by unlawful means. Proof of malice, i.e., an intent to injure, is essential in proof of a conspiracy." *Thompson Coal Co. v. Pike Coal Co.*, 488 Pa. 198, 211, 412 A.2d 466, 472 (1979) (citations omitted). Although the complaint plainly alleges that the Alldredge Defendants "engaged in a combined or concerted action to accomplish an unlawful purpose," *see* Consolidated Am. Compl. ¶ 218, it fails to allege that the Alldredge or Greene Defendants acted maliciously.[20] Without such an allegation, the complaint fails to state a claim of civil conspiracy for which relief may be granted. Thus, we will dismiss the civil conspiracy claim against all defendants.

### C. *Conclusion*

As noted, the Giannones, individually and on behalf of Joseph, seek to recover from the Alldredge Defendants on thirteen separate causes of action. Because they agreed to arbitrate their own claims, we will dismiss all thirteen of the Giannones' individual claims. In addition, we will dismiss the claims for RICO (Count I), negligent child abuse (Count III), fraud (Count IV), fraudulent misrepresentation (Count V), breach of contract (Count VII), negligent supervision (Count XI), and civil con-

spiracy (Count XXIII) that they assert on Joseph's behalf. We will, however, allow the Giannones to proceed with Joseph's claims for breach of fiduciary duty (Count VI), assault (Count VIII), battery (Count IX), negligence (Count X), intentional infliction of emotional distress (Count XII), and negligent infliction of emotional distress (Count XIII).[21]

The procedural consequences of these decisions have not escaped our attention. This litigation is now on two tracks, one arbitral, the other judicial. Because, as noted above, it is entirely possible that the arbitrators may ultimately conclude that the merits of this matter should return to our Court, it is entirely possible that we could twice confront the same merits, albeit in different claim dress. In the interest of judicial economy, therefore, we will stay our hand until the arbitral picture clarifies.

An Order follows.

### *ORDER*

AND NOW, this 29th day of October, 2003, upon consideration of defendants' motions to dismiss and plaintiffs' responses thereto, and in accordance with the accompanying Memorandum, it is hereby ORDERED that:

1. Defendants' motions to dismiss (docket entries # 8 and 18) are GRANTED IN PART AND DENIED IN PART, as follows:

a. Insofar as they assert plaintiffs' own causes of action, Count I, Counts III

---

**20.** The Giannones claim that the Alldredge Defendants "were more interested in generating revenue and improving their corporate and personal earnings than in the welfare of Joseph," Consolidated Am. Compl. ¶ 131, but this allegation falls short of the "intent to injure" that the Pennsylvania Supreme Court requires to state a cause of action for civil conspiracy.

**21.** The Greene Defendants have not filed a motion to dismiss, so we will not dismiss any of the claims against them stated in Count II and Counts XIV through XXII of the complaint.

through XIII, and Count XXIII are DISMISSED WITHOUT PREJUDICE; and

b. Insofar as they assert plaintiffs' causes of action as representatives of Joseph Giannone, Jr., Counts I, III, IV, V, VII, XI, and XXIII are DISMISSED WITH PREJUDICE;

2. Insofar as they relate to their own causes of action, and if they elect to press them, plaintiffs SHALL ARBITRATE Count I, Counts III through XIII, and Count XXIII;

3. By November 17, 2003, plaintiffs shall SHOW GOOD CAUSE for their failure to serve Lance Wells, Ray Gwilliam, Tom Harvey, Stan (Last Name Unknown), Sarah (Last Name Unknown), Travis (Last Name Unknown), Keith (Last Name Unknown), and John Doe Nos. 1–15, or all counts against these defendants shall be dismissed;

4. Except as to the preceding paragraph, this action is STAYED pending final arbitral action; and

5. The Clerk shall place this matter in CIVIL SUSPENSE.